## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THOMAS D'AMICO, | : | |
| | : | Civil Action No. 11-4168 (SDW) (MCA) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| KAREN BALICKI, PAULA T. DOW, | : | |
| | : | September 6, 2012 |
| Respondents. | : | |
| | : | |
| | : | |

**WIGENTON**, District Judge.

Before the Court is Petitioner Thomas D'Amico's ("Petitioner" or "D'Amico") Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition") challenging his convictions in the New Jersey Superior Court, Union County, for which he is currently serving a sentence at the South Woods State Prison, Bridgeton, New Jersey. This Petition is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated below, this Court **DENIES** D'Amico's Petition and **DECLINES** to issue a certificate of appealability.

## FACTUAL AND PROCEDURAL HISTORY

The New Jersey Supreme Court set forth the factual background of this case as follows:

> On the evening of October 23, 1999, Edward Gentile, Carmine Perrotti, Lewis Rodriguez, Christopher Longo, [Petitioner], Violet Arias, Ann Truzzolino, Alvin Baez, and Josephine Castagna were present at Sinners Go-Go Bar (Sinners) in Elizabeth. Some time around 10:30 p.m., Arthur McKeown and Bennett Grant arrived at Sinners. Truzzolino, who was a friend of McKeown's, approached the two men and McKeown introduced Grant to her. Later, several of Truzzolino's friends, including Arias and Castagna, joined that group.

1

> After 1:00 a.m., McKeown and Grant decided to leave.  Truzzolino
> joined them as they departed.  Arias, who had driven to Sinners
> with Truzzolino, followed them outside, where she convinced
> Truzzolino to return to the bar.  Grant objected and followed Arias
> and Truzzolino back inside Sinners.   Shortly thereafter, an
> argument ensued.  Sinners' management intervened and asked
> Grant to leave.  Grant acceded, exited Sinners and started to walk
> to the car with McKeown.  Arias, Truzzolino, and other patrons
> followed Grant and began screaming and running after him.  Arias
> approached and attempted to hit Grant.
>
> Tony Velez, a doorman at Sinners, testified that . . . [he] noticed a
> group of patrons run outside, surround Grant and McKeown and
> punch and kick them.   Eventually Grant and McKeown fled
> towards a nearby bridge with the crowd in pursuit.  At that time, a
> car pulled up and several people entered the car, which sped after
> Grant and McKeown.
>
> Joseph Machado, Sinners' general manager, and Pablo Fragoso,
> the club's operations manager, both testified that there was an
> altercation between Arias and Grant at Sinners that night. . . .
> [Fragoso] observed defendants and others kicking Grant. . . . .
> Eventually, Fragos pulled Arias away and tried to stop D'Amico
> from kicking Grant.  D'Amico was an Elizabeth police officer and
> was off duty the night of the incident.  . . . .  Fragroso then
> observed [Jean] Morales drop a Belgian block, weighing
> approximately twenty-five pounds, on Grant's head.  The crowd
> grew silent and began to disperse.

State v. Castagna, 187 N.J. 293, 300-01 (2006).  Grant died five months later as a result of the

various head injuries he suffered from the incident.  Id. at 302.

On June 7, 2000, D'Amico, Arias, Baez, Castagna, Gentile, Morales, and Perrotti were

charged in an eleven-count indictment.   Petitioner was charged with five counts in the

indictment: murder (Count 1), aggravated manslaughter (Count 2), two counts of official

misconduct (Counts 3 and 4), and obstructing administration of law (Count 11).  (Pet'r's Br. 1;

Resp't's Br. ¶1.)  Before the trial, four of Petitioner's six co-defendants: Arias, Baez, Gentile,

and Perrotti pled guilty to second degree reckless manslaughter.  (Pet'r's Br. 2.)

Subsequently, Petitioner proceeded to trial and was tried before the Honorable Walter Barisonek, J.S.C. ("Judge Barisonek").  The jury acquitted D'Amico of the murder charge but found him guilty of aggravated manslaughter, both counts of official misconduct, and obstructing administration of law.[1]  (Id. at 3.)  Petitioner was sentenced to twenty years in prison for the aggravated manslaughter conviction and pursuant to the New Jersey No Early Release Act ("NERA") D'Amico must serve at least eighty-five percent of that sentence.  (Id.)  Additionally, D'Amico was sentenced to a consecutive seven-year term on the official misconduct convictions. (Id.)

On August 29, 2002,[2] D'Amico appealed his convictions and sentence to the New Jersey Superior Court Appellate Division claiming that his trial counsel, Robert Norton ("Norton" or "trial counsel") provided him with ineffective assistance.  (Id.; Resp't's Br. ¶ 8.)  On April 12, 2005, the Appellate Division reversed Petitioner's conviction based, in part, on his ineffective assistance of counsel claim.  (Id.)  However, on July 17, 2006, the New Jersey Supreme Court reversed the Appellate Division's decision and reinstated D'Amico's conviction and sentence after it concluded that Petitioner had failed to demonstrate that he received ineffective assistance of counsel.  (Id. at 3-4.)

Subsequently, on March 22, 2007, Petitioner filed an application for Post-Conviction Relief ("PCR").  At the PCR hearing,[3] D'Amico asserted that he was denied effective assistance of counsel because Norton: (1) did not advise him of the State's plea offer, and (2) failed to conduct a pretrial conference to ascertain if he understood the State's final plea offer and his potential sentencing exposure, if convicted.  (Id. at 4.)  D'Amico also claimed that his

---

[1] On March 22, 2002, the trial court merged the obstructing administration of law count with the two counts of official misconduct.  (Pet'r's Br. 3.)
[2] D'Amico incorrectly asserts that he filed his notice of appeal on April 12, 2004.  (Pet'r's Br. 3.)
[3] The same judge, Judge Barisonek, presided over D'Amico's criminal trial and his PCR application and hearing. (Pet'r's Br. 2, 4.)

constitutional rights were violated.  (Id.)  On January 22, 2008, the trial judge denied D'Amico's PCR application.  On March 7, 2008, Petitioner appealed the PCR decision to the Appellate Division.  On May 3, 2010, the Appellate Division affirmed the PCR decision "substantially for the reasons expressed by Judge Barisonek in his well-reasoned oral decision of January 22, 2008."  State v. D'Amico, No. A-3187-07T4, 2010 N.J. Super. Unpub. LEXIS 954, at *11 (App. Div. May 3, 2010), certif. denied, 205 N.J. 79 (2011).  The Supreme Court denied Petitioner's petition for certification on January 20, 2011.  This Petition followed.

**LEGAL STANDARD**

Pursuant to 28 U.S.C. § 2254, an individual in custody as a result of a state court judgment may seek a writ of habeas corpus "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

> [f]ederal habeas corpus relief is precluded as to any claim that was adjudicated on the merits in a state court proceeding unless such adjudication:
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (quoting §§ 2254(d)(1) and (2)).  In Williams v. Taylor, the Supreme Court explained the standard of review as set forth in § 2254(d)(1).  529 U.S. 362 (2000).  According to the Court,

> [u]nder the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially

4

> indistinguishable facts.   Under the "unreasonable application"
> clause, a federal habeas court may grant the writ if the state court
> identifies the correct governing legal principle from this Court's
> decisions but unreasonably applies that principle to the facts of the
> prisoner's case.

Id. at 412-13.   The Court further explained that the "unreasonable application of" standard

inquires "whether the state court's application of clearly established federal law was objectively

unreasonable."  Id. at 409.


**DISCUSSION**

Petitioner asserts that he is entitled to habeas relief because he was denied his

constitutional rights to effective assistance of counsel, due process, and a fair trial in the state

courts.  (Pet'r's Br. 11-12.)

1. Ineffective Assistance of Counsel Claim

The United States Constitution grants the accused in criminal prosecutions the right "to

have the Assistance of Counsel."  U.S. Const. amend. VI.  The Supreme Court has recognized

that the criminal defendant's constitutional right to counsel is actually a "'right to the effective

assistance of counsel.'"  Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann

v. Richardson, 397 U.S. 759, 771, n.14 (1970)).  An attorney's assistance is ineffective if (1)

"counsel's representation fell below an objective standard of reasonableness;" and (2) "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different."  Id. at 689, 694.  "A reasonable probability is a probability sufficient

to undermine confidence in the outcome."  Id. at 694.

Petitioner claims that his constitutional right to the effective assistance of counsel was

violated for six reasons.  D'Amico claims that trial counsel:

1) Failed to accurately advise [him] of the penal consequences of proceeding to trial or request a pretrial conference to ensure [that he] understood the plea offer and the sentencing consequences if he lost at trial;

2) Failed to advise [him] of the final plea offer extended by the State, which [he] would have accepted had he been aware of it;

3) Made numerous and serious errors and omissions during the trial, including telling the jury in opening statements that [he] was "a criminal", who "disgraced the badge", enjoyed "no presumption of innocence", and was guilty of "one or more" crimes, and promised that [he] would testify, without previously disclosing this strategy to [him];

4) Elicited highly damaging and prejudicial testimony from [him] on direct examination;

5) Failed to object to the State's request for [him] to demonstrate the manner in which he kicked the deceased victim; and

6) Failed to object to the trial court's application of aggravating and mitigating factors at sentencing.

(Pet'r's Br. 37-38.)  This Court finds that Petitioner has not established a claim for ineffective assistance of counsel.

      a.   <u>Norton's Alleged Failure to Advise Petitioner of the Potential Penal Consequences of Going to Trial</u>

The appropriate inquiry in a habeas petition "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007).  In addition, "federal habeas courts [must] presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" <u>Id.</u> at 473-74 (quoting § 2254 (e)(1)).

Petitioner contends that Norton failed to provide him with accurate advice regarding the penal consequences of going to trial.  According to D'Amico, Norton advised him during a telephone conversation that "worst case scenario, we go to trial and you are going to get manslaughter like your codefendants ple[d] out to.  Best case scenario, agg[ravated] assault."

(23T40:5-7) (internal quotation marks omitted).[4]   At the PCR hearing, Petitioner stated that based on this conversation, he believed that his maximum penal exposure, if he went to trial, would be seven years.  (Id. at 41:6-8.)

However, there is evidence in the record suggesting that Petitioner understood that his sentence could be significantly greater, and that the above conversation was merely Norton's opinion of Petitioner's chance of success at trial.  For instance, D'Amico testified that during the telephone conversation he asked Norton, "you are telling me I'm not going to get hit with the big charges?" and Norton responded, "I don't see it happening."  (Id. at 40:8-9.)  Here, Norton was merely opining as to D'Amico's chances at trial.  Furthermore, Norton testified that he informed Petitioner about the sentencing ramifications if he was found guilty of murder.  (24T62:2-7.)  Trial counsel further testified that the "ongoing discussions" he had with Petitioner during the plea bargaining period included conversations about the difference between concurrent and consecutive sentencing.  (Id. at 61:9-10.)  Norton's testimony directly contradicts D'Amico's contention that trial counsel "did not explain that Official Misconduct [sentence] could run consecutive with the assault related charges."  (Pet'r's Br. 15.)  Moreover, according to Judge Barisonek, Petitioner "clearly from his own words knew he faced murder and aggravated manslaughter because he testified in the PCR hearing, I didn't kill him.  All I did was assault him."  (28T25:10-13) (internal quotation marks omitted).

In this case, D'Amico and trial counsel's conflicting testimony created an issue of fact, which Judge Barisonek reasonably resolved.  In making that determination, Judge Barisonek concluded that Petitioner "decided to take it to trial knowing that he faced murder and

---

[4] References to the record from the state court proceedings are as follows:
    22T—   Transcript of March 22, 2002 Sentencing Hearing
    23T—   Transcript of November 13, 2007 PCR Motion
    24T—   Transcript of November 15, 2007 PCR Motion
    28T—   Transcript of January 22, 2007 PCR Motion

aggravated manslaughter" and that "Norton did discuss with [D'Amico] the penal consequences faced from murder on down."  (Id. at 25:25-26:2, 26:5-7.)  Petitioner's burden at this stage is to provide clear and convincing evidence that he was misinformed about the sentencing ramifications of going to trial.  D'Amico has failed to do so.  Therefore, he is not entitled to relief under this basis.

> b.   Trial Counsel's Alleged Failure to Inform D'Amico of the Final Plea Offer

In Hill v. Lockhart, the Supreme Court held that "the two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel."  474 U.S. 52, 58 (1985).  However, the Court explained that counsel's representation may be considered ineffective only if his or her performance actually "affected the outcome of the plea process."  Id. at 59.  Accordingly, to state a legitimate claim for habeas relief under this basis, "a defendant must show that he was actually prejudiced by his attorney's failure to communicate a pre-trial plea offer; that is, that he himself—not a reasonable defendant in his place—would have accepted the offer had it been communicated to him."  Wheeler v. Rozum, 410 F. App'x 453, 458 (3d Cir. 2010), cert. denied, 131 S.Ct. 2469 (2011).

Petitioner contends that Norton's failure to inform him of the State's final plea offer constituted ineffective assistance of counsel because he would have accepted it.  This Court disagrees.  According to D'Amico, the last plea offer Norton informed him of was ten years for the manslaughter charge, subject to NERA.  (Pet'r's Br. 14; 23T38:7-11.)  D'Amico claims that he rejected that offer because of Norton's advice that the worst case scenario at trial would be a maximum sentence of seven years on the manslaughter charge.  (See Pet'r's Br. 15; see also 23T41:6-8.)  Thus, the issue here is whether Petitioner would have accepted the final plea

agreement or risked going to trial with the hope of obtaining a maximum sentence of seven years on the manslaughter count.

According to Union County Assistant Prosecutor Ann Luvera ("Luvera"), the final plea agreement she was authorized to make was seven years for manslaughter and a consecutive five-year term for official misconduct counts.  (24T11:19-22.)  However, Luvera's "independent recollection" was that the five year consecutive sentence was a negotiating option, and that the last offer she actually made to Norton was for a seven year consecutive sentence for the official misconduct counts.  (Id. at 12:7-19.)  Luvera also testified that D'Amico "wanted a concurrent offer.  He wanted the [seven], [eighty-five] percent, but a concurrent official misconduct, and the State was unwilling to give concurrent time."  (Id. at 14:4-7.)

At the PCR hearing, Judge Barisonek found that Petitioner would not have taken "any plea to an assault that [wa]s more than [ seven years] . . . ," and that "there was no way . . . that the Prosecutor . . . would agree to a [seven] with an [eighty-five] percent without a consecutive on the official misconduct."  (28T25:18-19, 21-24.)  As a result, Judge Barisonek found that Petitioner would not have accepted the offer even if it had been communicated to him.  (See id. at 35: 7-12, 22-24.)  Judge Barisonek's determination that Petitioner would not have accepted the final plea offer was reasonable because that offer included a consecutive sentence, which D'Amico did not want.

Nonetheless, D'Amico contends that he is entitled to relief under Missouri v. Frye, 132 S. Ct. 1399 (2012) and Lafler v. Cooper, 132 S. Ct. 1376 (2012).  (Supplement to Pet'r's Pet. 1-5).  This Court disagrees.   In Frye, the respondent was "charged with driving with a revoked license."  132 S. Ct. at 1404.  The prosecutor offered the respondent a plea agreement that would have reduced the charge to a misdemeanor, carrying with it a maximum one-year sentence and a

recommendation for a ninety-day sentence.  Id.  The respondent's attorney never informed him of the agreement.  Id.  Before a preliminary hearing on the charge, the respondent was once again arrested for driving with a revoked license.  Id.  The respondent eventually pled guilty without an underlying plea agreement, and was sentenced to three years in prison.  Id. at 1404-05.  Applying the first prong of the Strickland test, the Court found that trial counsel's failure to inform the respondent of the plea agreement fell below the objective standard of effective assistance.  Id. at 1409-10.  In applying the second prong of the test, the Court reiterated that "defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel."  Id.  The Court found that the respondent was prejudiced by counsel's failure to inform him of the plea offer "because he pleaded guilty to a more serious charge, with no promise of a sentencing recommendation from the prosecutor."  Id. at 1411.

The instant case is distinguishable.  D'Amico was not prejudiced by Norton's failure to inform him of the final plea offer because he did not plead guilty to a more serious charge and the facts indicate that he would not have accepted the final plea even if he had been made aware of it because the State did not offer him a concurrent sentence.

D'Amico's reliance on Lafler is also misplaced.  In Lafler, the respondent was charged with a number of offenses including assault with intent to murder.  132 S. Ct. at 1383.  The prosecution offered a plea agreement dismissing two of the charges and recommending a sentence of fifty-one to eighty-five months.  Id.  On the advice of counsel, the respondent rejected the offer.  Id.  He subsequently went to trial, was convicted, and was sentenced to "a mandatory minimum sentence of [one hundred and eighty-five] to [three hundred and sixty] months' imprisonment."  Id.

10

In concluding that the respondent's counsel was ineffective, the Supreme Court reiterated that "[i]n the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." Id. at 1384.  The Court, relying on the respondent's uncontradicted testimony and the lower court's discussion of the respondent's statement that he would have accepted the plea, concluded that the respondent satisfied this test.  Id. at 1391 (citing Cooper v. Lafler, 376 F. App'x 563, 571 (6th Cir. 2010)).

Here, on the other hand, the record contradicts D'Amico's testimony that he would have accepted the State's final plea offer if he had known about it.  Consequently, he has not satisfied the second prong of the Strickland test.

### c.   Trial Court's Failure to Request a Pretrial Conference

Petitioner also asserts that "[his] attorney's failure to inform him of the final plea offer was not remedied because the trial court never conducted a Pretrial Conference, and a Pretrial Memorandum was never prepared, contrary to the requirements of [Rule]s 3:9-1." (Pet'r's Br. 16.)  Rule 3:9-1 is a New Jersey Court rule.  Therefore, a court's failure to follow it does not constitute a "violation of the Constitution or laws or treaties of the United States."  § 2254(a).  Also, because this Court has already concluded that Judge Barisonek reasonably determined that Petitioner would not have accepted the State's final plea, a pretrial conference would have been of no assistance to Petitioner.  Thus, Norton's failure to request a pretrial conference does not constitute ineffective assistance of counsel.

### d.   Trial Counsel's Prejudicial Opening Statement and Failure to Discuss Trial Strategy

D'Amico maintains that Norton failed to provide effective assistance of counsel because he made inflammatory remarks during his opening statement.  (Pet'r's Br. 26-27.)  These inflammatory remarks included stating that Petitioner: (1) was "a criminal;" (2) "disgraced the

11

badge;" (3) enjoyed "no presumption of innocence;" and (4) was guilty of "one or more" crimes. (Id. at 26-27.)  Petitioner contends that these remarks are "so unreasonable under prevailing professional norms . . . that [trial counsel's] performance undermines confidence in the outcome of the trial."  (Id. at 27.)  Petitioner presented this argument during his direct appeal and on his PCR application.

The New Jersey Supreme Court found that

> Defense counsel was aware that the State would present substantial evidence against D'Amico on all of the charges. . . . .  Although defense counsel could have used less strident language in admitting D'Amico's involvement in the incident, on this record we do not conclude that defense counsel's high-risk strategy of admitting D'Amico's guilty to lesser-included offenses in the hope that it would enhance D'Amico's credibility, eventually leading to a not guilty verdict of the most serious offense, was *prima facie* evidence of ineffective assistance of counsel.

Castagna, 187 N.J. at 316.  According to the court, a finding of ineffective assistance of counsel would depend on whether Petitioner agreed in advance to Norton's trial strategy.  Id.

Subsequently, in his PCR application, Petitioner asserted that Norton provided ineffective assistance of counsel because he did not discuss trial strategy with him.  (Pet'r's Br. 4, 8.) However, at the PCR hearing, Norton testified that he discussed the trial strategy with Petitioner. According to Norton, he told Petitioner what he was going to say in his opening statement and Petitioner responded, "[w]hatever you think, Mr. Norton."  (24T89:5-10.)  Norton further testified that he informed Petitioner about "the actual wording that [he] would use, as it related to the official misconduct charges, in [his] opening."  (Id. at 89:11-14.)

Here, D'Amico and Norton presented conflicting testimony on the issue.  Therefore, Judge Barisonek made a credibility determination and concluded that trial counsel's reasoning in moving forward with this strategy was valid.  (Id. at 28-29.)  Judge Barisonek also found that the

overall strategy of "distracting" the jury from the murder charge by conceding to another charge and calling D'Amico a "criminal" with regard to the official misconduct charge, was a legitimate strategy under the circumstances.

In affirming Judge Barisonek's PCR ruling, the New Jersey Appellate Division noted Judge Barisonek's assertion that "[t]he defendant fabricated his testimony at the PCR hearing. I find that he told me the truth at trial, namely, it was his decision to testify and I find he was prepared to testify, because this was determined prior to the start of trial and prior to opening." State v. D'Amico, No. A-3187-07T4, 2010 N.J. Super. Unpub. LEXIS 954, at *20 (App. Div. May 3, 2010). As the Appellate Division pointed out, "[w]hen the appellate court is satisfied that the findings of the trial court could reasonably have been reached on sufficient, credible evidence present in the record, 'its task is complete and it should not disturb the result.'" Id. at *19 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

Similarly, this Court cannot grant habeas relief unless Judge Barisonek's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). This Court concludes that D'Amico has not made such a showing here.

e.   Prejudicial Testimony

Petitioner asserts that Norton failed to provide effective assistance of counsel because he advised the jury that Petitioner would testify even though he had not discussed with Petitioner if he would testify. D'Amico maintains that he believed he had to testify because trial counsel represented to the jury that he would. The record, however, contradicts D'Amico's assertions. At trial, Judge Barisonek had the following exchange with Petitioner prior to his testimony:

13

THE COURT:    It is each defendant's individual decision as to whether you wish to be a witness or not in the case, it is not your lawyer's decision. . . . Do you understand Mr. D'Amico?

D'AMICO:       Yes, sir.

THE COURT:    You've had enough time to speak to your attorney about that issue?

D'AMICO:       Yes, sir.

THE COURT:    Do you wish to testify as a witness?

D'AMICO:       Yes, sir.

(28T54:8-20) (internal quotation marks omitted).  The above indicates that D'Amico was aware that he did not have to testify.  In addition, he represented to Judge Barisonek that he had spoken to Norton about whether to testify.  Therefore, that is not a basis to find that D'Amico was denied effective assistance of counsel.

Petitioner further asserts that Norton elicited highly damaging testimony from him during direct examination that "provid[ed] the State with the greatest assistance possible in proving the charges against" him.  (Pet'r's Br. 31-32.)  Petitioner points to these seven specific statements:

(1) If Mr. D'Amico arrested Violet Arias and Mr. Grant when he first observed their conduct outside of the bar, Mr. Grant's death would not have taken place;

(2) After the crowd "piled" on Mr. Grant outside of the bar, Mr. Grant escaped and ran away toward the bridge with the crowd following;

(3) Mr. D'Amico pursued Mr. Grant along with the crowd in a lengthy chase over a fence to the bridge;

(4) When the crowd reached the victim on the bridge, Mr. D'Amico, along with the others, began kicking the victim;

(5) Mr. D'Amico kicked the victim on several occasions (when counsel told the jury during opening statements it was only one time),

(6) Mr. D'Amico did not stop the crowd from beating the victim or arrest them, but instead got into the jeep while the crowd further attacked Mr. Grant,

(7) Trial counsel also cast his client as a vicious, uncaring person by eliciting testimony from Mr. D'Amico concerning how he saw the victim struggle, even conceding that Mr. D'Amico was not sure if the victim was conscious, while he and the crowd continued to beat him and did nothing to help the victim.

(Id. at 32) (citations omitted).

14

However, the record indicates that D'Amico had notice of what he would be asked during direct examination but that trial counsel did not anticipate the answers D'Amico provided while he was on the stand.  For instance, Judge Barisonek found that Norton "testified [that] he prepped [Petitioner] before the trial and during the trial over the weekend [after] the State had rested, which was corroborated by [Petitioner]'s testimony."  D'Amico, 2010 N.J. Super. Unpub. LEXIS 954, at *17.  Further, Judge Barisonek noted that Norton "testified [that] he made flash cards of what would be asked and that [Petitioner] stated at the PCR hearing, however, he had no recollections of seeing or using flash cards."  Id.  See also (28T49:11-15.)  Specifically in reference to the question of how many times D'Amico kicked the victim, Judge Barisonek found that "based on Mr. Norton's testimony . . .  Mr. Norton was surprised that Mr. D'Amico said two times, as opposed to one time, which he said in pre-trial preparation."  (28T51:6-9.)  According to Judge Barisonek, "D'Amico had told Mr. Norton in prep that he kicked the victim only one time" and "Mr. Norton said he asked these questions because he knew Violet Arias, in her statement, told the Prosecutor that [D'Amico] kicked the victim multiple times."  (Id. at 51:13-17.)  Petitioner has not provided any evidence establishing that Judge Barisonek's conclusion was unreasonable.

Petitioner also alleges that Norton "failed to object when the State requested that [he] demonstrate for the jury the alleged manner in which he kicked the victim."  (Pet'r's Br. 33; 16T149:21-23.)  Petitioner asserts that "[t]his highly prejudicial testimonial act, which would not have occurred if trial counsel had not forced [him] to testify, was no different than an outright admission of guilt."  (Pet'r's Br. 33.)  As discussed earlier, the record does not indicate that Petitioner was forced to testify.  Moreover, Norton testified that on the weekend before Petitioner testified, he discussed with Petitioner the possibility of reenacting the kick during cross-

examination.  (24T115:9-16.)   According to Norton, he merely wanted Petitioner to give a truthful reenactment of the kick.  (<u>Id.</u> at 115:25, 116:1.)  Therefore, he and Petitioner practiced a "solid" kick that did not appear sufficiently severe enough to cause death.  (<u>Id.</u> at 116:14-17.) However, trial counsel testified that during D'Amico's cross-examination, D'Amico became "annoyed" and demonstrated the kick on a hollow object resulting in a kick that appeared different than what was practiced.  (<u>Id.</u> at 116:18-25, 117:1-21.)

At the PCR hearing, Judge Barisonek held that Norton was not ineffective for failing to object to the reenactment request because "even if he did object, he would have been overruled." (28T50:15-22.)   In light of Judge Barisonek's conclusion and the fact that trial counsel anticipated the State's request for Petitioner to reenact the kick and practiced the kick with Petitioner, this Court agrees that Norton's failure to object did not constitute ineffective assistance of counsel.

> f.   <u>Norton's Failure to Object to the Trial Judge's Application of Aggravating and Mitigating Factors</u>

During sentencing, the trial court applied aggravating sentencing factors N.J.S.A. § 2C:44-1(a)(1), (3), and (9).  (Pet'r's Br. 35.)   Petitioner takes issue with Norton's failure to object to the court's application of aggravating factors (3) and (9).  D'Amico also takes issue with trial counsel's failure to object when the court did not apply mitigating factor (9).  D'Amico argues that trial counsel's conduct "constitutes blatant ineffective assistance of counsel."  (<u>Id.</u> at 35-37.)

Norton's failure to object to the application of aggravating factor (9) did not cause his advocacy to fall below the objective standard of reasonableness.  Aggravating factor (9) speaks to "[t]he need for deterring the defendant and others from violating the law."  N.J. Stat. Ann. § 2C:44-1(a)(9).  During the sentencing, Judge Barisonek stated that "[t]here is a strong need to

deter you and anybody else from this behavior." (22T24:10-11.)  Furthermore, Judge Barisonek referred to "the nature of the beating, the running down, the nature of the assault and the eventual death . . . [as] extremely heinous and cruel."   (Id. at 24:19-22.)   Here, the overwhelming likelihood is that Judge Barisonek would have overruled any objection Norton made.  Though Petitioner asserts that the objection should have been made "on the grounds that the aggravated manslaughter statute was a sufficient deterrent," (Pet'r's Br. 36), he does not provide any legal support for this assertion.  Moreover, the application of aggravating factor (9) was appropriate under these facts because the State has a strong interest in the specific and general deterrence of "heinous and cruel" behavior that results in death.

Additionally, Norton's failure to object to the court not applying mitigating factor (9) does not amount to ineffective assistance of counsel.  Mitigating factor (9) applies when "[t]he character and attitude of the defendant indicate that he is unlikely to commit another offense." N.J. Stat. Ann. § 2C:44-1(b)(9).  Petitioner asserts that the court should have applied mitigating factor (9) because "[he] accepted responsibility for his actions and apologized to the family [of the victim] in a statement prior to sentencing," and "there [wa]s nothing in the record that reflect[ed] a poor attitude or that [he wa]s likely to commit another offense."  (Pet'r's Br. 36.) First, a pre-sentencing apology letter is not alone sufficient to convince a court that a criminal's character and attitude are such that he is unlikely to commit another offense.  Such a letter is but one item the judge may use to evaluate a defendant's overall character.  See State v. Randolph, 210 N.J. 330, 349 (2012); State v. Natale, 184 N.J. 458, 472 (2005).  Second, the record suggests that Petitioner does have a poor attitude, and that he might commit another offense.  Indeed, the "extremely heinous and cruel" nature of the crime as well as the fact that it involved pursuit and continued attack would be reasonable bases to conclude that Petitioner has an attitude that leans

toward violence.  Additionally, Judge Barisonek pointed out that "[Petitioner] obviously ha[s] a temper problem."  (22T24:2-3.)  Based on the above, Norton's representation did not fall to an objectively unreasonable standard when he failed to object to Judge Barisonek's decision not to apply mitigating factor (9).

Petitioner also maintains that trial counsel should have objected to the trial court's application of aggravating factor (3).  This argument lacks merit.  Under the second prong of the Strickland test, D'Amico must establish that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  At the time of Petitioner's sentencing, New Jersey law provided that "unless the preponderance of aggravating or mitigating factors . . . weighs in favor of a higher or lower term . . . when a court determines that a sentence of imprisonment is warranted, it shall impose sentence . . . [t]o a term of [twenty] years for aggravated manslaughter."  N.J. Stat. Ann. § 2C:44-1(f)(1)(a).  Therefore, even if Norton had successfully objected to the court's application of aggravating factor (3), the court's decision to apply aggravating factor (9) and mitigating factor (3) would have left Petitioner with two aggravating factors and two mitigating factors.  This does not constitute a "preponderance of aggravating or mitigating factors."  Thus, Petitioner would have been subject to a twenty-year sentence.  Accordingly, Norton's failure to object to the court's application of aggravating and mitigating factors does not establish that he provided ineffective assistance of counsel.

2.  Disproportionate Sentence Claim

Petitioner maintains that the trial court erred in imposing a consecutive sentence that was disproportionately severe.  (Pet'r's Br. 38.)  As an initial matter, this Court notes that according to the Third Circuit, "[t]he contention that gross disparity in sentences violates due process or

equal protection lacks merit." Jones v. Superintendent of Rahway State Prison, 725 F.2d 40, 43 (3d Cir. 1984). D'Amico's assertion that his sentence is unduly disproportionate to those given to his co-defendants presents only a "possible error of state law." Id. Nevertheless, this Court will briefly address Petitioner's arguments.

D'Amico asserts that the trial court erred in making his sentence for official misconduct run consecutive to his sentence for aggravated manslaughter. (Pet'r's Br. 38.) First, Petitioner contends that the trial court misapplied the factors set forth in State v. Yarborough, 100 N.J. 627 (1985). (Pet'r's Br. 40.) The sentencing guidelines provide that a court may impose a consecutive sentence "when sentence is pronounced on one occasion on an offender who has engaged in a pattern of behavior constituting a series of separate offenses." Yarborough, 100 N.J. at 644. Petitioner asserts that the trial court should not have imposed a consecutive sentence because he "was not involved in 'a series of separate offenses.'" (Pet'r's Br. 40) (quoting Yarborough, 100 N.J. at 644). However, in imposing a consecutive sentence, Judge Barisonek noted that while "part of the official misconduct involved the affirmative act of committing the crime itself . . . it also involved in terms of the merger the not reporting and the involvement afterwards." (Pet'r's Br. 39-40; 22T27:18-28:14.) As a result, this Court concludes that it was not unreasonable for the trial court to impose a consecutive sentence.

Second, Petitioner, relying on State v. Bullock, 136 N.J. 149 (1994), State v. Stevens, 222 N.J. Super. 602 (App. Div. 1988), and State v. Sosinski, 331 N.J. Super. 11 (App. Div. 2000), asserts that New Jersey courts do not impose consecutive sentences for official misconduct convictions. (Pet'r's Br. 41.) None of the cases D'Amico relies on stand for the proposition that a sentence for official misconduct cannot run consecutively to an aggravated manslaughter

sentence.   Accordingly, the cases do not establish that the trial court's imposition of a consecutive sentence was inappropriate.

Third, D'Amico contends that in comparison to his co-defendants' seven-year sentences, his twenty seven-year sentence is "disproportionately severe and in conflict with the goals of uniformity and proportionality in sentences."   (Pet'r's Br. 42.)   Petitioner asserts that his sentence is in violation of State v. Roach, which held that when sentencing co-defendants, "[t]he trial court must determine whether the co-defendant is identical or substantially similar to the defendant regarding all relevant sentencing criteria."   146 N.J. 208, 233 (1966).

This Court is not persuaded by D'Amico's argument because it finds that D'Amico's status as a police officer and his failure to make a plea agreement with the State are sufficient to distinguish him from his co-defendants.   As a result, his sentence is not unreasonably disproportionate, even under the standards set by Roach.

   3.   Due Process Claim

Petitioner asserts that "[t]he trial court's denial of [his] motion to use the polygraph results to challenge the credibility of Arias, a key witness, violated [his] rights to due process and a fair trial."   (Pet'r's Br. 42.)   According to Petitioner, the polygraph results "demonstrate that Arias' proposed testimony was deemed deceptive," and therefore the trial court "caused false testimony to be used in obtaining [Petitioner]'s conviction."   (Id. at 44.)   Petitioner cites to a number of United States Supreme Court cases holding that due process is violated when criminal prosecutors utilize false testimony to obtain convictions.   (Id. at 43.)

D'Amico raised a similar argument in his appeal.   Castagna, 187 N.J. at 307-08.   In concluding that the trial court's failure to allow Petitioner to cross-examine Arias with "the results of the polygraph test was harmless beyond a reasonable doubt," the New Jersey Supreme

Court noted that "the right of confrontation is not absolute."  Id. at 309.  Furthermore, the court

pointed out that

> [a]lthough [D'Amico] w[as] not permitted to refer to the polygraph
> test results, [he] w[as] permitted to elicit testimony from Arias that
> when she was confronted with evidence that her statements were
> not true, she gave a different sworn statement implicating herself.
> The jury was told that something happened between the time Arias
> gave her statement the morning of and her later statement on
> September 4, 2001, that revealed that she was not telling the truth.
> Moreover, during cross-examination [D'Amico] w[as] able to
> establish that Arias had not changed her story because she could
> "live with the lie no more."
>
> Beyond that, the evidence from other witnesses of [D'Amico]'s
> participation in the assault on Grant was substantial . . . .  Several
> witnesses placed D'Amico in the passenger seat of the Jeep, and
> Mr. Mojica testified that the person in the passenger seat opened
> the door, striking Grant.  D'Amico testified that he kicked Grant
> and demonstrated the manner in which he kicked him.

Id. at 312-13.

Based on the above, the court concluded that D'Amico was permitted to "cross-examine

Arias concerning the change in her statement and that she had been confronted with evidence

that she was not being truthful."  Id. at 313.

"The central concern of the Confrontation Clause is to ensure the reliability of the

evidence against a criminal defendant by subjecting it to rigorous testing in the context of an

adversary proceeding before the trier of fact."  Maryland v. Craig, 497 U.S. 836, 845 (1990).

Here, D'Amico has the opportunity to test the "believability" and "truth" of Arias's testimony.

Davis v. Alaska, 415 U.S. 308, 316 (1973).  As a result, Petitioner has failed to establish that the

New Jersey Supreme Court's conclusion was unreasonable.

4. <u>Cumulative Error Doctrine</u>

Petitioner asserts that the errors discussed above cumulatively entitle him to habeas corpus relief. (Pet'r's Br. 45.) As the Third Circuit has noted, "the cumulative effect of the alleged errors may violate due process, requiring the grant of [a] writ [of habeas corpus]." <u>U.S. ex rel. Sullivan v. Cuyler</u>, 631 F.2d 14, 17 (3d Cir. 1980). Based on this Court's conclusions that: (1) trial counsel's assistance was not ineffective, (2) Petitioner's sentence was not unreasonably disproportionate to the sentences of his co-defendants, and (3) the trial court did not err in allowing the State to use Arias' testimony, this Court finds that Petitioner has not established a basis for relief under the cumulative error doctrine.

5. <u>Certificate of Appealability</u>

For the reasons discussed above, this Court denies a certificate of appealability because Petitioner has not demonstrated a "substantial showing of the denial of a constitutional right" as required under 28 U.S.C. § 2253(c)(2). <u>See</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

**CONCLUSION**

For the reasons set forth above, this Court **DENIES** Petitioner's Petition and **DECLINES** to issue a certificate of appealability.

<u>s/Susan D. Wigenton, U.S.D.J.</u>

cc:    Madeline Cox Arleo, U.S.M.J.